IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | Case No. 1:24-CR-96 |
| | ) | |
| v. | ) | Honorable Rossie D. Alston |
| | ) | |
| LOUIS EUGENE STAUDENMAIER | ) | Sentencing Date: January 22, 2025 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## <u>UNITED STATES'S POSITION ON SENTENCING</u>

The United States of America, by and through its undersigned counsel, hereby submits its position on the sentencing of Louis Eugene Staudenmaier (hereinafter, "Staudenmaier" or the "defendant"). The defendant has pled guilty to one count of receipt of material involving the sexual exploitation of minors, otherwise known as child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1). The applicable guidelines range has been correctly calculated in the Presentence Investigation Report ("PSR") as 168-210 months' imprisonment. *See* Dkt. No. 81 (PSR) at ¶ 115. For the reasons that follow, the United States respectfully submits that a 168-month sentence at the low end of the Guidelines is sufficient but not greater than necessary to effectuate the statutory sentencing factors under 18 U.S.C. § 3553(a). The Court should further impose a fifteen-year term of supervised release, forfeiture of the electronic devices used in connection with the offense, and restitution and special assessments as set forth by statute and pursuant to the plea agreement.

## I.    Factual Background and Procedure Posture

Beginning in July 2022, an agent with Homeland Security Investigations (HSI) identified

the defendant's Internet Protocol ("IP") address as one sharing files containing child sexual abuse material ("CSAM") on the BitTorrent network. Two different law enforcement agents downloaded five files containing CSAM from this IP address on three separate occasions in July and October 2022. On January 12, 2023, HSI agents executed a federal search warrant at the defendant's home in Ashburn, Virginia, and seized fourteen items of digital media for forensic examination. An HSI computer forensic examiner, Special Agent ("SA") Michael Del Vacchio, analyzed these devices. Of those fourteen items of digital evidence, child sexual abuse material has been found on three of them (items 3, 6, and 13), artifacts related to child sexual abuse material were found on another two devices (items 1 and 10), non-actionable (under federal law) child exploitative material was found on one of the devices, five devices were clean, and three devices remain encrypted. Of the still encrypted devices, one (item 14) is a server containing 12 hard drives, which law enforcement can prove also contains child sexual abuse material.

### A. Item 1 (Silver Western Digital External Hard Drive)

SA Del Vacchio located artifacts associated with CSAM, as well as a particular BitTorrent client, qBittorent, on Item 1, a Silver Western Digital External Hard Drive. For example, SA Del Vacchio discovered a folder entitled "QB," which appears to refer to qBittorent. The "QB" folder contained five sub-folders: "ADULT dealer part 2," "Child 2," "CP," " █████ 2016," and "X." While the "QB" folder still exists on Item 1, the forensic examination revealed that these subfolders were deleted beginning on or about January 5, 2023, and ending on or about January 6, 2023. SA Del Vacchio also identified suspected CSAM .torrent files within the recycle bin on this device.

SA Del Vacchio found file names indicative of the existence of suspected CSAM videos within the $LogFile for Item 1. This is a metafile that records data from such file system

transactions as file creation, deletion, data changes, and name changes. For instance, the logfile showed that a file named █████▌████████████████████████████████████ ████████" was deleted on January 10, 2023. Another file, "████████████," was deleted on January 10, 2023.

Of note, SA Del Vacchio also found evidence establishing that the defendant was the user of Item 1. For example, this device contains a document created on January 26, 2022, and authored by Louis Staudenmaier; a September 3, 2014, email from the defendant to his wife; and a Google takeout profile picture of Louis Staudenmaier created on June 3, 2022.

## B. Item 3 (4TB WD External Hard Drive)

SA Del Vacchio found over 2000 videos and 5000 pictures of child sexual abuse material on Item 3, a 4TB WD External Hard Drive. SA Del Vacchio found CSAM images in several locations on this hard drive, including folders such as ████████████████████████ ████████████████████████████████████████████████████████ ████████"████████████████████████████████████████████████ ████████████████████████,"[2] "█████████████████████████ ████████████████████████ He also found CSAM videos in several locations on this hard drive, including folders named "Frostwire\,"[3] "Pedo\Videos\," "_cp\," and "cP\."

These CSAM images and videos were found in top-level folders with user-generated naming conventions designed to appear innocuous, such as "01," "LG Smart TV," "New folder,"

---

[1] ██████ stands for "███████████████" and is a term commonly associated with CSAM.
[2] The ██████ series in a known CSAM series out of Eastern Europe.
[3] "Frostwire" is another form of peer-to-peer software that is used by some offenders to obtain child sexual abuse material.

"New folder (3)," "NewNew," and "P." The examiner located additional folders in the recycle bin that contained CSAM with user-generated naming conventions, such as "Pics," "_cp," "cP," "Frostwire," "New" (with subfolder "!!New!! ███ 2007"), "Pedo" (with subfolder "Videos"), and "TN," as well as a folder referencing "█████████," a name associated with a known CSAM series, ████████, which was also found in the defendant's collection.

SA Del Vacchio also found "TN" files, which are cached thumbnail images of photos and videos that are created when an external device, such as a hard drive or thumb drive, is connected to an LG Smart TV. There are .tn3 files with file names indicative of CSAM in the "TN" subfolder inside both the "$RYDLY9D" folder in the Recycle Bin and the "LG Smart TV" folder. The existence of these .tn3 files in both folders strongly suggests the defendant used his LG Smart TV to view CSAM stored on Item 3, ███████████████████████████████ ████████████████.

SA Del Vacchio also compared artifacts from the "QB" folder on Item 1 with recycle bin artifacts on Item 3 and identified several files and folders with identical characteristics such as file name, file size, and created date. These files include: "The ███████████████████ ██████████████████████ ████████████████████████ ███████," ██████████████████████████████████████" █████████████████████████████," [4] and "████████████." This

suggests that the defendant put CSAM files onto Item 1, which he then transferred to Item 3 and deleted from Item 1.

### C. Item 6 (Microsoft Surface Tablet)

On Item 6, a Microsoft Surface Tablet, SA Del Vacchio found approximately 1,721 CSAM images and 5,076 child exploitative images, as well as other evidence of possession and receipt of such materials. All of the CSAM on this tablet existed in the thumb cache. Many of the CSAM artifacts on this device are associated with files apparently located on the UNRAID "GALACTICA" server (Item 14), described below, which remains encrypted, but is known to contain CSAM. The forensic exam revealed that these cache images were created as a result of the defendant using the tablet to access and view the CSAM stored on the UNRAID server. The examiner was only able to determine a date of access for a single such cached image, which occurred on July 14, 2022. The operating system was installed or updated on January 31, 2022, indicating that all the retrieved cached files were created on the tablet after that date.

In a list of links to files that a user accessed via Windows File Explorer and associated with a "lstau" user (as in "Louis Staudenmaier") account on the tablet, SA Del Vacchio found a number of files indicative of CSAM. In addition to the username associated with the tablet, there were other instances of the defendant's name on this device, confirming that he was the user of this tablet. For example, one document appeared to be a contract for services that was electronically signed by the defendant.

SA Del Vacchio also found keyword searches on the system for "████" and "████" the name of another known CSAM series; the National Center for Missing and Exploited Children (NCMEC) has confirmed that multiple videos and images from the "████" series were located on the defendant's devices, including on Items 3 and 13. Files were found with names indicative

of CSAM in LNK files (shortcut files that point to other files in the system), Locally Accessed Files and Folders (a refined result that contains information about local and network resources that have been accessed by the user), MRU Opened_Saved Files (containing information about last files accessed by an application through 'Open File' or 'Save File' dialog windows), and MRU Recent Files & Folders (containing information about files recently opened or saved).

### D.  Item 10 (Samsung Solid State Drive)

SA Del Vacchio identified artifacts on a Samsung Solid State Drive (Item 10) relating to CSAM.  The conversion.log file, which is a record of media files that were converted from one format to another, contained the following titles of interest:

- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ''
- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ''
- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

He also found a title of interest in the "failed_conversions" file: ▓▓▓▓▓▓▓▓ – ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ."  Finally, he found additional titles of interest in the "successful_conversions" file:



- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ [5]
- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ''
- ▓▓▓▓▓▓▓▓▓▓▓▓

### E.  Item 13 (ASUS Laptop)

Item 13, an ASUS Laptop Computer, contained evidence that the defendant received and distributed CSAM, including approximately 104 images that depicted minors engaged in sexually explicit conduct.  The qbittorrent.log file contained logs generated by qBitTorrent while it was running on the operating system.  The forensic examination further revealed that

---

[5] The same file name appears on Item 3 in the LG TV folder.

qBittorrent had been installed on that device on September 26, 2022. The accompanying log files showed that the user accepted the accompanying "legal notice," acknowledging awareness of qBitTorrent's distribution function, as well as records of download activity of CSAM-indicative file names.

There was also evidence attributing the defendant as the user of the device, including a photo of the defendant and a receipt for the purchase of the UNRAID operating system (which is the operating system that would run Item 14, the UNRAID Server). The defendant had also installed the Galactica UNRAID application on Item 13, which would have allowed him to log into and access the server from that laptop.

SA Del Vacchio also identified forensic artifacts, such as file explorer artifacts (evidencing access by the user), jump list files (lists of recent applications or files that a user launched), LNK files (windows shortcut files that point to other files on the system), MRU recent files and folders (containing information about files that were recently opened or saved and folders that were opened), VLC Prefetch files (used to speed up launching of frequently used executables), and Shellbags (which track folder access by keeping logs of the view mode of a folder and indicate that a particular path has been previously viewed), all of which included CSAM indicative files or folders.

Also present in the "Identifiers – Device" artifact for Item 13 is the volume serial number for Item 3. This artifact indicates that Item 3 had been previously connected to the ASUS laptop (Item 13) and that Jump lists, LNK files, and Prefetch files found on Item 13 are associated with files on Item 3. This is proof that the defendant used his laptop, Item 13, to access CSAM files on Item 3.

### F.  Item 14 (UNRAID "Galactica" Server)

Item 14, the UNRAID "Galactica" server containing 12 hard drives, remains encrypted and inaccessible.[6]  However, the server was connected to Item 13 at the time the defendant's devices were seized from his residence.  During the execution of the search warrant, agents took a photograph capturing the content of the screen at that time, which included folders named "cP," "Frostwire," and "Pedo":



These folder names are also identical to ones observed in the recycle bin on Item 3, as described above, including the ▉▉▉▉ folder.  Further, the folder structure for the folders in these two locations is almost identical.  The last modified dates for all these folders on the server reflect January 11 and January 12, 2023, the date of the search warrant.

SA Del Vacchio found a number of artifacts on Item 13 associated with this UNRAID

---

[6] Although it was a condition of the parties' plea agreement that the defendant assist the government to unencrypt this server, he appears unable to do so.

server, including files names indicative of CSAM. He also found evidence on Item 6, the tablet, which indicated that the defendant was accessing and viewing CSAM saved on the UNRAID server via that tablet.

### G. Defendant's Statement

During the residential search warrant, the defendant was read his *Miranda* rights and gave a statement, which was video recorded. On a scale of one to ten, the defendant rated himself a six in terms of computer proficiency. He stated that he understood what peer-to-peer software is and affirmed his understanding of it. He confirmed that he had a computer downstairs that was a "hobby computer," which he also used to control the house systems. When law enforcement pivoted to asking about child sexual abuse material, the defendant invoked his right to counsel.

### H. The Charges

On May 8, 2024, the Grand Jury returned an Indictment in which it charged the defendant with one count each of attempted distribution of material involving the sexual exploitation of minors (i.e., child pornography), in violation of 18 U.S.C. § 2252(a)(2)/(b)(1); receipt of material involving the sexual exploitation of minors, in violation of 18 U.S.C. § 2252(a)(2)/(b)(1); and possession of material involving the sexual exploitation of minors, including material depicting prepubescent minors and minors who had not attained 12 years of age, in violation of 18 U.S.C. § 2252(a)(4)(B)/(b)(2). On October 16, 2024, the defendant pled guilty to Count 2 and agreed to forfeit items 1, 3, 6, 8, 10, and 14.

## II.    Statutory Penalties and Guidelines Calculations

Receipt of child pornography carries a minimum term of 5 years' imprisonment with a maximum term of 20 years' imprisonment. *See* 18 U.S.C. § 2252(a)(2) and (b)(1). Following

any term of imprisonment, the defendant must be placed on supervised release for a term of at least 5 years up to life. *See* 18 U.S.C. § 3583(k).

As the Court is aware, although the Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). Thus, at sentencing, a court "must first calculate the Guidelines range" applicable to the defendant. *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007). Here, the PSR correctly calculated the total offense level for the defendant under the Guidelines as follows:

| Guideline | |
|---|---|
| Base offense level because the defendant was convicted of 18 U.S.C. § 2252(a)(2) (U.S.S.G. § 2G2.2(a)(2)) | 22 |
| The material involved a prepubescent minor or a minor who had not attained the age of 12 years. (U.S.S.G. § 2G2.2(b)(2)) | +2 |
| The defendant knowingly engaged in distribution. (U.S.S.G. § 2G2.2(b)(3)(F)) | +2 |
| The offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, or the sexual abuse or exploitation of an infant or toddler. (U.S.S.G. § 2G2.2(b)(4)) | +4 |
| The offense involved the user of a computer or interactive service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material. (U.S.S.G. § 2G2.2(b)(6)) | +2 |
| The offense involved at least 600 images. (U.S.S.G. § 2G2.2(b)(7)(D)) | +5 |
| **TOTAL OFFENSE LEVEL** | 37 |

PSR at ¶¶ 71-84.

The defendant has demonstrated acceptance of responsibility for this offense by pleading guilty and is therefore entitled to a two-level decrease in offense level under U.S.S.G. § 3E1.1(a). *Id.* at ¶ 83. This two-level decrease is correctly reflected in the PSR. Despite the defendant's

self-serving statement now that he has taken responsibility for his actions "[f]rom the moment law enforcement officers left [his] home after executing a search warrant" and has "never made excuses for [his] behavior, blamed [his] situation on anything but [him]self, denied responsibility for [his] actions, or tried to justify what [he] had done," PSR at ¶ 70, the defendant failed to assist authorities in the prosecution of his own misconduct by timely notifying the government of his intention to enter a plea of guilty. In fact, the defendant attempted to make excuses, deny responsibility, and blame a number of other people, including the two law enforcement agents whom he accused of perjury and the assigned government attorney whose ethics in the sharing of discovery material he questioned. The defendant forced the government to prepare expert witnesses necessary to contradict inaccurate assertions in his motions and also to fully prepare this case for trial. He pleaded only at the last moment when it became apparent that his motions were meritless and he would be unable to avoid a conviction. There will be no motion for the additional one-level decrease in the offense level pursuant to U.S.S.G. § 3E1.1(b).

The defendant's criminal history score is one, resulting in a Criminal History Category I. *Id.* at ¶ 87. Based on a total offense level of 35 and a Criminal History Category I, the defendant's Guidelines sentencing range is 168-210 months of incarceration. *Id.* at Part D.

**A. Defendant's Objections to Guideline Calculation**

The defendant has objected to the two-level enhancement for knowing distribution, claiming that there is no evidence that the defendant distributed child sexual abuse material to any specific individual. This position is patently frivolous. Furthermore, the defendant confuses the "statute's definition of distribution" from that found in the guidelines. ECF No. 78 at 17. The guidelines define distribution as "any act, including possession with intent to distribute, production, transmission, advertisement, and transportation, related to the transfer of material

involving the sexual exploitation of a minor." U.S.S.G. § 2G2.2, App. Note 1. While the defendant tries to avoid accepting responsibility for the fact that he contributed to the dissemination of child sexual abuse material by using qBitTorrent, there is nothing "technical[]" or "inadvertent" about his actions. ECF No. 78 at 17. The enhancement not only applies, it should be applied, because it captures the harm that the defendant has done.

### i. Five images were distributed on three occasions to two agents.

On July 13, 2022, HSI SA Daniel Schneider used the program Torrential Downpour to connect with a device sharing suspected child pornography. *See* ECF No. 28-5 at ¶ 13. This device was located on the BitTorrent peer-to-peer file sharing network. *Id.* SA Schneider made a direct connection to this device, which was assigned the IP address ███████. *Id.* As even the defense agrees, starting on July 1, 2022, this IP address was assigned to the defendant. *See* ECF Nos. 28-2 at ¶ 7, 32-4. SA Schneider downloaded files associated with the torrent info hash ending in 6e17b. *See* ECF No. 28-5 at ¶ 13. The logfile for this date reflects that the user associated with that IP address was using a particular BitTorrent program, namely qBittorrent version 4.4.3.1, to download and share files. *See* ECF No. 32-5, at line 12 ("version: -qB4431-").

Within this torrent were two folders titled "asian" and "european sex," which contained image files. *Id.* Both SA Schneider and, later, HSI SA Brandy Oliva reviewed the downloaded images and concluded that, in their training and experience, these files appeared to depict child pornography. *Id.* Three of these files were described in SA Oliva's search warrant affidavit as follows:

a. File folder: █████

    File name: ████████████████████████████

    File description: ████████████████████████



b. File folder: █████

    File name: ████████████████████

    File description: ████████████████████████

c. File folder: █████

    File name: ████████████████████████

    File description: ████████████████████████

On July 14, 2022, SA Schneider again used the program Torrential Downpour to connect with a device sharing suspected child pornography. *See* ECF No. 28-5 at ¶ 14. This device was again located on the BitTorrent peer-to-peer file sharing network. *Id.* SA Schneider again made a direct connection to the device, which was assigned IP address ███████████, and downloaded files associated with a torrent info hash ending in ef20f4. *Id.* The main file folder

---

[7] "████" stands for "████████████" and is a term commonly associated with child sexual abuse material (CSAM).

located within this torrent was "███████." SA Oliva's affidavit described this file as follows:

File name: ████████████████████████

File Description: 



On October 16, 2022, Virginia State Police Special Agent Michael Sponheimer used the program Torrential Downpour to connect with a device sharing suspected child pornography. *Id.* at ¶ 15. This device was again located on the BitTorrent peer-to-peer file sharing network. *Id.* SA Sponheimer made a direct connection to the device, which was assigned IP address ████████, and downloaded files associated with a torrent info hash ending in d2259a. *Id.* SA Oliva's affidavit described this file as follows:

File name: ████████████████

File Description:

These are five examples of the defendant distributing child sexual abuse material to at least two different people on three separate occasions.

The forensic examination of the defendant's devices corroborated the law enforcement downloads from the defendant. For example, on Item 10, SA Del Vacchio found in a "successful_conversions" file a record of a file with the same name as one of the images successfully downloaded by SA Schneider on July 13, 2022. *See* ECF No. 28-5 at ¶ 13(a). On Item 13, SA Del Vacchio confirmed that the defendant had downloaded qBittorent, which is the

same peer-to-peer software with which SA Schneider connected on July 13, 2022. *See* ECF No. 32-5 at line 12 ("version: - qB4431-"). Also on Item 13, SA Del Vacchio found log files for the defendant's activity in qBittorent, which included adding to the download list a folder with the same name as the folder containing the file downloaded by SA Schneider on July 14, 2022. *See* 28-5 at ¶ 14. Finally, on Item 6, SA Del Vacchio found a list of links to files that the user accessed with names indicative of CSAM. This list included files with the same names as those downloaded by SA Schneider and described at paragraph 13(a) and (b) of SA Oliva's affidavit. These two files were accessed on July 15, 2022, two days after law enforcement successfully downloaded and viewed portions of them from the defendant's IP address. This Item 6 list included files with the same names as that downloaded by SA Schneider and described at paragraph 14(a) of SA Oliva's affidavit (accessed on July 15, 2022, one day after law enforcement successfully downloaded and viewed portions of it from the defendant's IP address) and that downloaded by SA Sponheimer and described at paragraph 16(a) of SA Oliva's affidavit (accessed on July 14, 2022, approximately three months before law enforcement downloaded it from the defendant's IP address).

If the defendant was distributing to law enforcement, that means that he was also making his CSAM collection available to all other qBittorent users to download as well.

### ii.    The defendant was aware that he was distributing.

The defendant's assertion that he was unaware of qBittorent's sharing function is also demonstrably false, a clear attempt to minimize his conduct and the harm that he has done. The defendant agreed to the following legal notice when he installed qBittorent:



The defendant must have agreed to this legal notice in order to successfully install qBittorent on September 26, 2022, which the logs on Item 13 establish he did; without agreeing to this notice, the defendant would not have been able to affect this installation.

The defendant falsely claims that this was "fine print," akin to "terms and conditions," "voluminous and complex 'legal jargon,'" and "multiple pages of fine print detailing the terms of use." ECF No. 78 at 17. The government leaves it to the Court to decide if the above notice is any of these things.

After installation, every time the defendant downloaded child pornography, he knew that he was sharing it as well, which is borne out by the qBittorent statistics on his laptop:



When interviewed, the defendant admitted that he understood how peer-to-peer software works, and the "pay to play" function of peer-to-peer software is perhaps one of its most basic aspects.

He cannot claim to understand how peer-to-peer software works and then disclaim knowledge of the inherent sharing function. This is simply another attempt to minimize his culpability.

There is no question that the defendant both shared child sexual abuse material with law enforcement and that he knew he would be doing so, and the Court should find that the enhancement applies.

### B. Defendant's Objections to Use of the Guidelines

The defendant has challenged the application of the guidelines to his own case, in part by continuing to minimize his own conduct. This challenge is misplaced. He points to the United States Sentencing Commission's "2012 Report to the Congress: Federal Child Pornography Offenses" (hereinafter, "the 2012 Report"),[8] which examined federal sentencing policy in child pornography cases, focusing primarily on non-production offenses under U.S.S.G. § 2G2.2. At the outset, the 2012 Report confirms the terrible impact of child pornography on both the children depicted and society at large. *The 2012 Report*, at vi-vii. Not only does the distribution, transportation, and possession of child pornography devastate the depicted children, but it also undermines society by perversely validating, for the defendants in these cases, the sexual exploitation of increasingly younger children. *Id.*

In his justification for seeking a downward variance, the defendant argues that many of the enhancements application in this case tend to apply in nearly every case now due to technology advances and thus fails to distinguish between those more and less culpable. But the 2012 Report does not endorse a general lowering of the Guideline ranges or base offense levels for child pornography offenders. The 2012 Report did note that some enhancements that were

---

[8] https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses.

originally intended to provide additional proportional punishment for aggravating conduct now routinely apply to the majority of offenders and suggested changes to the Guidelines so that they will better distinguish among more or less culpable offenders. Accordingly, the Commission suggested several new categories of Specific Offense Characteristics to increase sentences for aggravating conduct that is not being accounted for by the current Guidelines.

The Sentencing Commission made the following recommendations in the 2012 Report about what sentencing courts should consider in arriving at an appropriate sentence in a non-production case: (a) the content of an offender's child pornography collection and the nature of an offender's collecting behavior; (b) the degree of an offender's engagement with other offenders; and (c) whether an offender has a history of engaging in sexually abuse, exploitative, or predatory conduct in addition to his child pornography offense. *The 2012 Report* at 320.

The 2012 Report explained that <u>even if only one</u> of these aggravating factors is present, an enhanced punishment is warranted. *Id.* at 321. And if the defendant has aggravating factors in more than one category, then a more severe sentence may be warranted. *Id.* As explained in more detail below in the Section 3553(a) analysis, here, the first two of those aggravating factors are present -- the content of the defendant's CSAM collection and the nature of his collecting and organizational behavior, as well as his engagement with qBittorent, which is a community for engagement with other offenders and sharing of CSAM material. An enhanced punishment is warranted, and a significant custodial sentence within the advisory guidelines range is appropriate.

## III.    Section 3553(a) Factors

After calculating the Guidelines range, a sentencing court must then consider that range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is

appropriate and reasonable for the individual defendant.  *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  As explained below, consideration of these factors suggests that a Guidelines sentence is appropriate in this case.

### A.  The nature, circumstances, and seriousness of the defendant's offense

The nature and circumstances of the defendant's offense conduct, which demonstrate a high level of engagement with child sexual abuse material, warrant a 168-month sentence of incarceration and a significant term of supervised release.  The defendant came to the attention of law enforcement because he was sharing his CSAM collection with other users on BitTorrent. When law enforcement executed a search warrant at his home, they discovered a laptop, which had been used to share and receive CSAM, as well as an extensive, curated collection of CSAM that had been moved between at least two external hard drives.  The defendant had also been using his tablet computer to view CSAM saved on a 12-hard drive server.  Although the government can prove that this server contains CSAM, it cannot say how much because the server remains encrypted.  A conservative undercounting of the defendant's collection comes to over 2000 videos and over 6500 images of child sexual abuse material.

This vast collection included particularly heinous and disturbing material.  In one such video, ████████████████████████████████████████████████████ ████████████████████████.  PSR at ¶¶ 43-44.  Another video ████████████████████████

███████████████████████████████████████████. PSR at ¶ 48.  In another

video, ███████████████████████████████████████████████████████

███████████████████.  PSR at ¶¶ 38-39.  Another recovered filename indicated a

compilation, titled in relevant part "███████████████████████████."  PSR at ¶ 51.

Thus, the nature of the defendant's collection alone, apart from any other considerations,

warrants a sentence that adequately reflects the wrongfulness of his conduct and the harm

repeatedly caused to so many victims.

Child pornography offenses are extraordinarily serious offenses, and certainly are not

victimless crimes.  As the Supreme Court has recognized, all child pornography crimes

"produce[] concrete and devastating harms for real, identifiable victims."  *Paroline v. United

States*, 572 U.S. 434, 457 (2014).  Such crimes inherently involve the sexual abuse of children,

even if no new child pornography is produced.  *See New York v. Ferber*, 458 U.S. 747, 759

(1982).  Trafficking in child pornography is "intrinsically related to the sexual abuse of children

in at least two ways."  *Id.*  First, increased demand for child pornography is associated with

increased supply:  Far from being victimless, trafficking in child pornography "harms children in

part because it drives production [of child pornography], which involves child abuse."  *Paroline*,

572 U.S. at 439-40; *see also Ferber*, 458 U.S. at 759.  ("[T]he distribution network for child

pornography must be closed if the production of material which requires the sexual exploitation

of children is to be effectively controlled.").

Second, "[i]t is well established that children featured in child pornography are harmed

by the continuing dissemination and possession of that pornography.  Such images are 'a

permanent record of the children's participation and the harm to the child is exacerbated by their

circulation.'"  *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *Ferber*, 458

U.S. at 759); *accord United States v. Accardi*, 669 F.3d 340, 345 (D.C. Cir. 2012) ("[C]hild pornography creates an indelible record of the children's participation in a traumatizing activity, and the harm to the child is only exacerbated by the circulation of the materials."). "Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *accord United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters"). These children "must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," and they "suffer a direct and primary emotional harm when another person possesses, receives or distributes the material." *Sherman*, 268 F.3d at 547-48.

Here, the defendant perpetuated the victimization of dozens of real children whose exploitation is memorialized in the graphic depictions of their abuse, which the defendant downloaded and distributed. As the victims (and victims' representatives) write in their impact statements, which are attached to the PSR, they continue to suffer deeply by the defendant's actions – collecting such images and videos, taking a perverse pleasure in the heinous sexual abuse they endured, and passing those images on so that others may take similar pleasure. For these victims, the trauma and pain endures long after the abuse itself stops. These victims continue to suffer devastating consequences from the knowledge that offenders like the defendant consistently view images and videos that depict their sexual abuse. And while the defendant now admits his conduct and accepts responsibility for his actions, the irreparable harm

he has caused to the victims of his offenses nevertheless warrants a substantial term of incarceration. In imposing its sentence, this Court should also recognize that due to the defendant's sophisticated means of file encryption, the government  -- despite its best efforts -- will never be able to identify all the victims in this case. Thus, although the defendant has acknowledged his guilt by way of a plea, not all his actual victims will receive due recognition and/or restitution.

### B.  The history and characteristics of the defendant

The defendant has displayed both a concerning penchant for increasingly more arousing (for him) images of children being sexually abused and an inability to control his urges to view that material.

First and foremost, the court should be concerned by the disturbing lack of empathy the defendant has exhibited in collecting the sort of material he possessed, which is the best evidence of his predilections. As detailed above, the defendant received material depicting the sexual abuse of infants and toddlers, as well as the rape of minors ranging between 5 and 12 years old. Particularly as a father of young children, the defendant should have understanding and empathy for the vulnerability of such young children, to say nothing of an urge to nurture and protect rather than to derive sexual pleasure from their abuse, humiliation, and trauma. Regardless of his motivation or any other circumstances, his sexual urges demonstrate a lack of empathy, a lack of self-control, and an interest in particularly abusive and abhorrent content. Before getting caught, the defendant devoted considerable energy to protecting and encrypting his materials, and none to seeking treatment or trying to conform his behavior to the bounds of the law or moral decency. Moreover, his use of encryption shows that he knew the wrongfulness of his conduct even as he indulged in it and took significant measures to hide it from law enforcement and others. It also

demonstrates a level of technical sophistication that sets him apart from many other offenders.

With regard to his personal history, ███████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████. The defendant did not commit this crime in isolation,

reading a stash of old magazines to which no one else had access. Rather, he participated in the

search for and gave access to an ever-widening network of both old and new material.

Furthermore, this need for more and more stimulation over time is consistent with a

spectrum of offending that can result in more direct engagement with minors to sate the same

urges. And those sexual urges evince a sexual interest in children. "[T]he act of viewing child

pornography does not necessarily exist in isolation, and the behaviors associated with viewing

and possessing child pornography often extend beyond 'just looking at pictures.'" Jessica

Owens, et al., *Investigative aspects of crossover offending from a sample of FBI online child

sexual abuse cases*, Aggression and Violent Behavior, 30: 3-14 (2016). "Child pornography

offending is a valid diagnostic indicator of pedophilia. Child pornography offenders were significantly more likely to show a pedophilic pattern of sexual arousal during phallometric testing than were comparison groups of offenders against adults or general sexology patients. In fact, child pornography offenders, regardless of whether they had a history of sexual offenses against child victims, were more likely to show a pedophilic pattern of sexual arousal than were a combined group of offenders against children." James M. Cantor and Michael C. Seto, *Child Pornography Offenses Are a Valid Diagnostic Indicator of Pedophilia*, J Abnorm. Psychol., 115(3):610-5 (2006); *see also* U.S.S.C., "2012 Report to Congress: Federal Child Pornography Offenses," ["Report"] Chapter 4, p. 77 ("Sexual interest in children and corresponding sexual gratification are significant motivators for most child pornography offenders.").

The defendant also seems unable or unwilling to control those urges. In the defendant's own words: "I not only admit that I committed a sex offense, but at the time I was doing it I tried to stop but could not." Even after he came under the care of Dr. Berlin and the supervision of the Court, the defendant sought out scantily-clad images of young girls on the internet despite knowing that his pre-trial services officer would find out. ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████

The defendant's likelihood of reoffending is directly impacted by his sexual interest in minors. According to *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, Ryan C. W. Hall, M.D. and Richard C.W. Hall, M.D., P.A., Mayo Clin. Proc. (April 2007), "The published rates of recidivism are in the range of 10% to 50% for pedophiles depending on their grouping." ████████████ ██████████████████████████████████████████████, ██████████████

24

████████████████████████████

████████  Such self-reporting is generally unreliable.  *See* Hindman, J. & Peters, J.M. (2001), *Polygraph testing leads to better understanding adult and juvenile sex offenders*, Federal Probation, 65(3), 8–15. A combination of a lengthy term of incarceration combined with appropriate sex offender treatment and followed by a significant term of supervision is the most effective way to prevent the defendant from recidivating after his release.  If nothing else, the defendant's actions warrant careful monitoring in the future, particularly given how young his own children are and the risk he poses to them.

### C.  The need to promote respect for the law and afford adequate deterrence to criminal conduct

A sentence within the Guidelines imprisonment range is sufficient but not greater than necessary to deter the defendant and others from engaging in this conduct in the future. Considering the nature of the defendant's conduct, the government maintains that there is a risk of recidivism and hands-on offending associated with this defendant.  Though no study or expert can predict whether this defendant will or will not choose to return to exploiting children, his actions suggest that such concerns are well-founded.  The defendant's large, curated collection of child sexual abuse material and failure to abide by pre-trial conditions indicates an ongoing sexual interest in children and a disregard for their wellbeing and the law.  Thus, a significant sentence is necessary to deter the defendant from engaging in this dangerous and harmful conduct after he is released.

## IV.  Supervised Release

The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release . . . is not a punishment in lieu of incarceration."  *United States v. Granderson*, 511 U.S. 39, 50 (1994).  Instead, it "fulfills rehabilitative ends, distinct from those

served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Under 18 U.S.C. §

3583(k), the authorized term of supervised release here is at least five years and up to life. This

five-year mandatory minimum term reflects a heightened concern for recidivism among sex

offenders and the need for supervision over time. *See, e.g.*, Lifetime Consequences for Sex

Offenders Act of 2002, H.R. Rep. No. 107–527 at 2 (2002) ("[S]tudies have shown that sex

offenders are four times more likely than other violent criminals to recommit their crimes [and

that] . . . the recidivism rates do not appreciably decline as offenders age"); H.R. Conf. Rep. No.

108-66, at 49–50 (2003) (discussing how amendment to 18 U.S.C. § 3583(k) "responds to the

long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the

existing supervision periods for sex offenders . . . whose criminal conduct may reflect deep-

seated aberrant sexual disorders that are not likely to disappear within a few years of release

from prison"). Notably, the Guidelines recommend a lifetime term of supervised release for sex

offenders, *see* U.S.S.G. § 5D1.2(b) (Policy Statement), and the Fourth Circuit has observed that

§ 3583(k) and 5D1.2(b) jointly "reflect[] the judgment of Congress and the Sentencing

Commission that a lifetime term of supervised release is appropriate for sex offenders in order to

protect the public." *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks

and citations omitted).

## V.    Special Assessments Under the Justice for Victims of Trafficking Act (JVTA) & the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA)

The Justice for Victims of Trafficking Act (JVTA) imposes a mandatory assessment of

$5,000 on any non-indigent defendant convicted of, among other offenses, distribution of child

pornography.[9]   *See* 18 U.S.C. § 3014.  While the statute is silent as to how to determine

---

[9] The money obtained from this assessment goes to the Domestic Trafficking Victims' Fund, which awards grants and enhances programming for victims of human trafficking and child

indigence, courts have treated the imposition of this assessment like the imposition of other post-conviction assessments, where "[t]he defendant bears the burden of proving both his inability to pay at the time of sentencing and that he is not likely to become able to pay a fine upon his release from his term of imprisonment." *United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017) (internal citations and quotation marks omitted). Relevant factors to consider in this determination include a defendant's future earning potential, assets, educational background, employment history, age, and physical condition. *See United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020) ("[W]e agree with our sister circuits that a district court may consider a defendant's future earning potential when determining his ability to pay an assessment under 18 U.S.C. § 3014(a)." (citations omitted)); *see also United States v. Mann*, 770 F. App'x 649, 650 (4th Cir. 2019).

Here, the PSR details the defendant's financial condition based largely on his own self-reporting and concludes that he appears to be able to pay these various special assessments. PSR at ¶ 113. The defendant is physically capable of working following his term of incarceration. He was consistently employed prior to his incarceration. *Id.* at ¶¶ 103-09. He should be able to generate enough income in his lifetime to pay a $5,000 special assessment. *See* 18 U.S.C. § 3613 (noting that the liability to pay a fine or restitution shall terminate the later of 20 years from the entry of judgment or 20 years after the release from imprisonment, whichever is later); *see also United States v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018). Accordingly, the United States respectfully requests that the Court find the defendant non-indigent and impose the mandatory $5,000 special assessment under 18 U.S.C. § 3014.

---

pornography. The § 3014(a) assessment is payable after the defendant has satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim compensation. *See* 18 U.S.C. § 3014(b) & (e).

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA). The Act instructs that, in addition to any restitution or other special assessment, courts "shall assess not more than $35,000 on any person convicted of . . . [an] offense for trafficking in child pornography." 18 U.S.C. § 2259A(a)(2). Assessments collected under this statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* 18 U.S.C. §§ 2259(d), 2259B, and shall be paid in full after any special assessment under 18 U.S.C. § 3013 and any restitution to victims of the defendant's offense, *see* 18 U.S.C. § 2259A(d)(2). In determining the amount to be assessed under 18 U.S.C. § 2259A, courts should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and the guidance in 18 U.S.C. § 3572 for the imposition of fines. *See* 18 U.S.C. § 2259A(c). The United States respectfully requests that the Court impose a reasonable special assessment under 18 U.S.C. § 2259A, in addition to the $100 mandatory special assessment for his felony conviction pursuant to 18 U.S.C. § 3013.

## VI.    Restitution

Pursuant to 18 U.S.C. §§ 2259 and 3663, the defendant must pay restitution in the "full amount of the victims' losses as those losses are defined by Section 2259(c)(2)." PSR at ¶ 13. *See also Paroline*, 572 U.S. at 458 ("[A] court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses."). As part of the plea agreement entered into by the parties, the defendant has agreed that restitution is mandatory under § 2259 and that the Court must enter restitution in an amount not less than $3,000 per victim. *Id.* The government has received twenty restitution requests at this time, as set forth in the probation report and the accompanying attachments. PSR at ¶ 67. The defendant has not objected to those requests, and the government

asks that the Court enter a proposed restitution order at sentencing.

The government also asks that the Court order the defendant to pay the ordered restitution in full within two weeks. The Crime Victim's Right's Act give victims "the right to full and *timely* restitution as provided in law." 18 U.S.C. § 3771(a)(6) (emphasis added). The federal fine statute also favors immediate payment -- "A person sentenced to pay a fine or other monetary penalty, including restitution, *shall make such payment immediately*, unless, in the interest of justice, the court provides for payment on a date certain or in installments. If the court provides for payment in installments, the installments shall be in equal monthly payments over the period provided by the court, unless the court establishes another schedule." 18 U.S.C. § 3572(d)(1) -- and if that cannot be effectuated, the "*shortest time* in which full payment can reasonably be made." 18 U.S.C. § 3572(d)(2). As established in the PSR, the defendant has substantial assets, which will allow him to cover the restitution amount in full, PSR at ¶ 112, and he should be ordered to do so.

## VII.    Forfeiture

The parties filed a consent order of forfeiture at the change of plea hearing. ECF No. 75. The United States respectfully requests that the Court order such forfeiture as part of the judgment.

## VIII.    Conclusion

For the reasons stated above, the United States respectfully requests that the Court impose a sentence that includes a term of imprisonment of 168 months at the low end of the correctly calculated advisory Guidelines range, a fifteen-year term of supervised release, a $100 special assessment pursuant to 18 U.S.C. § 3013, a $5,000 special assessment pursuant to 18 U.S.C. § 3014, a reasonable special assessment under 18 U.S.C. § 2259A, forfeiture, and restitution as

set forth in the PSR and the government's proposed restitution order.

Respectfully Submitted,

Jessica D. Aber
United States Attorney

By:      <u>   /s/                             </u>
Laura D. Withers
Assistant United States Attorney
Nadia C. Prinz
Special Assistant United Staes Attorney (LT)
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Email: laura.withers@usdoj.gov